IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

CARLTON BRANTLEY, LARRY          *
DOWDELL, MELVIN GRIFFIN,
PONDIEL MABRY, CONNIE MCCOY,     *
HAYWARD PARHAM, REGINAL
RICHARDSON, JERRY STARKS, LARRY  *
THOMPSON, WILLIAM MARSHALL,
GODFREY BIGGERS, PATRICK         *
STROUD, CALVIN WILLIAMS and
HENRY CRAWFORD,                  *

    Plaintiffs,                  *

vs.                              *    CASE NO. 4:10-CV-77 (CDL)

MUSCOGEE COUNTY SCHOOL           *
DISTRICT, DON A. COOPER, JR.,
KINARD LATHAM, CAROL FRENCH,     *
MARIE STRINGFELLOW, THOMAS M.
SHELLNUTT, SR., and JERRY DUCK,  *

    Defendants.                  *

_____

O R D E R

INTRODUCTION

Plaintiffs Godfrey Biggers, Carlton Brantley, Henry
Crawford, Larry Dowdell, Melvin Griffin, Pondiel Mabry, William
Marshall, Connie McCoy, Hayward Parham, Reginal Richardson,
Jerry Starks, Patrick Stroud, Larry Thompson, and Calvin
Williams (collectively, "Plaintiffs") are current and former
plant services and custodial employees of Defendant Muscogee
County School District ("School District"). Plaintiffs accuse
the School District of engaging in a pattern of racial

discrimination that relegated certain black employees to a modest retirement system called the Public School Employees Retirement System ("PSERS") while manipulating the rules to make a more generous retirement plan called the Teachers Retirement System ("TRS") available to similarly-situated white employees. Plaintiffs, who are black, assert that they were placed in the PSERS because of their race and that some of the School District's employees fraudulently prevented them from being placed in the TRS.

Plaintiffs' entire case hinges on one former School District employee's incorrect understanding of the TRS eligibility requirements. That employee, Defendant Kinard Latham ("Latham"), served as the School District's plant services director from 1974 to 1996. Plaintiffs assert that Latham's testimony regarding the TRS eligibility requirements establishes that each Plaintiff was actually eligible for TRS enrollment but was denied an opportunity to enroll. It is clear, however, that Latham never had any responsibility for approving or rejecting TRS applications. It is also obvious that Latham's understanding of the TRS eligibility requirements was just plain wrong. Therefore, Latham's testimony cannot establish what criteria the TRS used to determine eligibility, and it cannot establish that Plaintiffs were eligible for TRS enrollment.

Latham's misunderstanding about the TRS eligibility requirements led to some enrollment application mistakes during the 1980s. The evidence suggests that Latham permitted several employees to cheat on their TRS applications by inflating their job titles to include the word "manager" or "supervisor." Based on the application mistakes permitted by Latham, the TRS accepted several plant services employees as members even though they were not qualified for membership. When Latham tried to help more employees (including several Plaintiffs) join the TRS in 1993, he used the employees' actual titles instead of inflated titles. In response, the TRS found that the employees were not qualified for TRS membership because they were not managers or supervisors. The TRS also provided the School District with a clear definition of the terms "supervisor" and "manager."

Latham's mistakes triggered several School District investigations, which led to process changes in the School District's personnel department. Latham's mistakes also led to miscommunication, gossip and distrust among plant services employees. Due to Latham's mistakes, plant services personnel who believed that they were unfairly excluded from the TRS made a series of complaints over the years, including a complaint to the NAACP in 1998 and a state court lawsuit in 2007. What is clear now, however, is that while the TRS permitted a few plant

services employees to enroll in the TRS during the 1980s based on mistakes in their TRS applications, Plaintiffs were not eligible for TRS enrollment based on their job titles and job duties.

The School District and Defendants Don A. Cooper, Jr., Carolyn French,[1] Marie Stringfellow, and Jerry Duck (collectively, "School District Defendants") filed summary judgment motions as to each Plaintiff: Godfrey Biggers (ECF No. 88), Carlton Brantley (ECF No. 104), Henry Crawford (ECF No. 90), Larry Dowdell (ECF No. 91), Melvin Griffin (ECF No. 94), Pondiel Mabry (ECF No. 89), William Marshall (ECF No. 96), Connie McCoy (ECF No. 99), Hayward Parham (ECF No. 100), Reginal Richardson (ECF No. 95), Jerry Starks (ECF No. 93), Patrick Stroud (ECF No. 92), Larry Thompson (ECF No. 97), and Calvin Williams (ECF No. 103).  As discussed in more detail below, these motions are granted as to Plaintiffs' federal law claims, and the Court declines to exercise jurisdiction over Plaintiffs' state law claims, which are dismissed without prejudice.

Defendant Latham filed a summary judgment motion as to all Plaintiffs.  As discussed in more detail below, Latham's summary judgment motion (ECF No. 101) is granted as to Plaintiffs' federal law claims, and the Court declines to exercise

---

[1] French's first name is Carolyn, not Carol as Plaintiffs alleged.  The parties sometimes refer to French by her new last name, Garrett.  For the sake of simplicity, the Court refers to her as French.

jurisdiction over Plaintiffs' state law claims, which are dismissed without prejudice. Defendant Thomas M. Shellnutt, Sr. filed a summary judgment motion as to all Plaintiffs. As discussed in more detail below, Shellnutt's summary judgment motion (ECF No. 102) is granted as to Plaintiffs' federal law claims, and the Court declines to exercise jurisdiction over Plaintiffs' state law claims, which are dismissed without prejudice.

Plaintiffs also seek summary judgment on their 42 U.S.C. § 1981 and 42 U.S.C. § 1983 claims against the School District and Defendants Don A. Cooper, Jr., Kinard Latham and Carolyn French. For the reasons set forth below, Plaintiffs' motion (ECF No. 105) is denied.

Finally, all Defendants ("Defendants") filed a motion to strike certain documents filed by Plaintiffs on July 28, 2012 because the filings were untimely and far exceeded the narrow scope set by the Court for the filings. Even though Plaintiffs blatantly disregarded the Court's order regarding the deadline and the scope of the supplemental responses to Defendants' summary judgment motions, the Court has reviewed Plaintiffs' untimely supplemental filings and concludes that they do not make a difference in the outcome of the summary judgment motions. Defendants' Motion to Strike (ECF No. 158) is therefore moot.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

The summary judgment process requires the attorneys for the parties to distill the record to an understandable description of the facts that are relevant to the question whether a genuine dispute exists to be tried.  The process also requires the attorneys for the parties to explain the law in a cogent manner to assist the Court in applying it to the alleged material facts.  Dumping data onto the docket with the expectation that the Court will somehow decipher it is both ineffective and unprofessional.  In this case, counsel for Plaintiffs filed voluminous exhibits without any reference to them in their briefs or fact statements, filed exhibits beyond the deadlines

set by the Court, filed untimely supplemental fact statements with their final reply brief, failed to include specific citations to the record supporting their fact statements as required by the Court's local rules, included footnote references in their briefs but did not include the actual footnotes, routinely cited to "deposition highlights" instead of the actual depositions, and in general, regularly failed to provide clear citations to the record. Defendants' counsel's written advocacy also created challenges for the Court. Rather than providing the Court with a coherent and understandable description of the relevant facts, counsel's briefing contained a voluminous collection of facts that lacked organization, requiring the Court to piece together the jumbled facts into an understandable and organized narrative of what happened from Defendants' perspective. Requiring the Court to search through a massive record to ferret out the facts is ineffective, contrary to the Court's rules, and below the Court's expectations. Notwithstanding these shortcomings in the attorneys' written advocacy, the Court has painstakingly reviewed the present record to determine whether a genuine factual dispute exists to be tried.

DISCUSSION

## I.   **Plaintiffs' Federal Law Claims**

Each Plaintiff asserts claims for racial discrimination, contending that the School District and certain School District employees denied them access to the more generous pension plan—the TRS—because of their race.   These claims are asserted against the School District and the individual employees who allegedly discriminated against Plaintiffs pursuant to 42 U.S.C. § 1981 ("§ 1981") and 42 U.S.C. § 1983 ("§ 1983") (denial of equal protection).   One Plaintiff, Carlton Brantley, also asserts his racial discrimination claim against the School District under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").   A thorough review of the record reveals that most of these claims are barred by the applicable statute of limitations.   Moreover, those claims that are timely are unsupported by sufficient evidence of racial discrimination to survive summary judgment.

The Court observes that Plaintiffs attempted to assert additional federal law claims in their summary judgment briefing.   Plaintiffs argue that Defendants have made it more difficult for employees to enter the TRS and that Defendants took these actions in retaliation for Plaintiffs' complaints of discrimination.   Pls.' Mot. for Summ. J. 3, 7, ECF No. 105. They also contend that they have a property interest in TRS

membership and that Defendants have deprived them of this property interest without due process of law. Pls.' Mem. in Resp. to Defs.' Mots. for Summ. J. 5, ECF No. 127. And Plaintiffs appear to raise a disparate impact theory in their reply brief in support of their summary judgment motion, arguing that categorical denial of TRS membership to custodial supervisors has a disparate impact on black employees because most custodians are black. Pls.' Resp. to Defs.' Opp'n to Pls.' Mot. for Summ. J. 6-7, ECF No. 161. Plaintiffs did not assert a retaliation claim, due process claim, or disparate impact claim in their Second Amended Complaint. They are not permitted "to raise new claims at the summary judgment stage." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004) (per curiam). Therefore, the Court declines to consider Plaintiffs' new retaliation, due process, and disparate impact theories.

## II. Plaintiffs' Federal Claims: Timeliness Analysis

Before the Court reaches the merits of Plaintiffs' federal law claims, the Court must address Defendants' argument that Plaintiffs' § 1981 and § 1983 claims are untimely.[2] The statute for Plaintiffs' § 1983 claims is two years. *See Lovett v. Ray*, 327 F.3d 1181, 1182 (11th Cir. 2003) (per curiam) (applying Georgia's two-year statute of limitations for personal injury

---

[2] Defendants do not contend that Plaintiff Carlton Brantley's Title VII claim is untimely.

actions to § 1983 claims).  The statute of limitations begins to run when "the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights."  *Id.* at 1182 (internal quotation marks omitted).  Therefore, Plaintiffs must establish that the alleged § 1983 violations occurred on or after July 13, 2008 or that, if they occurred before that date, Plaintiffs could not reasonably have discovered the violations until on or after July 13, 2008.

The statute of limitations for Plaintiffs' § 1981 claims is four years.  *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004) (applying catch-all four-year statute of limitations of 28 U.S.C. § 1658 to actions arising under § 1981 as amended by the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071).  For their § 1981 claims, therefore, Plaintiffs must establish that the violations occurred on or after July 13, 2006 or that, if they occurred before that date, Plaintiffs could not reasonably have discovered the violations until on or after July 13, 2006.

The Court will recount the facts relevant to the statute of limitations inquiry for all Plaintiffs, and then the Court will address the statute of limitations arguments for each Plaintiff. Unless otherwise noted, the facts are undisputed.

A.   Facts Relevant to Statute of Limitations Inquiry for
     All Plaintiffs

Defendant Latham became the School District's director of
plant services in 1974.  Defs.' App. of Docs. in Resp. to Pls.'
Mot. for Summ. J. Ex. 101, Mem. from N. Patterson to B. Nail
(Feb. 12, 1974), ECF No. 126-1.[3]  Latham served in that role
until he retired in 1996.  Latham Dep. 13:21-14:2, ECF No. 98-
89.  Latham has had no role with the School District since 1996.
After Latham retired, Leon Bell became plant services director,
and he served in that position until he died in 2000.  Ben
Russell became the School District's director of plant services
after Bell, and he served in that role until 2002.  James
Tanksley became interim director of plant services in 2002 and
director in 2003.  Robert Stansell succeeded Tanksley in the
position and became plant services director in 2010.

TRS membership is open to teachers.  O.C.G.A. § 47-3-60(a).
For purposes of the TRS, the term "teacher" includes full-time
"maintenance managers or supervisors" and "warehouse managers or
supervisors."  O.C.G.A. § 47-3-1(28)(E).  Therefore, it is
undisputed that a plant services employee must be a manager or
supervisor to be eligible for the TRS.

---

[3] Defendants did not point the Court to an authenticated version of
this exhibit (and several others).  Plaintiffs also submitted exhibits
that were not authenticated.  Neither party raised an authenticity
objection.  The Court finds that both Plaintiffs and Defendants waived
any authenticity objections for purposes of summary judgment.

It was Latham's understanding that "supervisor" meant a person who supervised a person, tool, or task. Latham Dep. 28:8-29:13. As discussed in more detail below, Latham's understanding was incorrect. Apparently in keeping with his understanding, Latham tried to help a number of non-supervisor plant services employees whose roles encompassed supervisory responsibilities join the TRS—sometimes successfully and sometimes unsuccessfully. It is undisputed that several plant services employees were granted membership in the TRS during the 1980s even though they were not managers or supervisors. Cooper Dep. 107:10-109:5, ECF No. 98-97. These employees were admitted to the TRS because Latham permitted them to "list erroneous job titles for themselves" on their TRS applications. Jones Dep. 29:15-24, ECF No. 123-6 (citing previous affidavit testimony). According to Plaintiffs, the non-supervisory plant services employees who were accepted to the TRS were white. Pls.' Facts to Which There Are No Genuine Issues ¶¶ 13-15, ECF No. 105 at 22-23.

In 1993, Latham tried to help several more plant services employees join the TRS, including Plaintiffs Godfrey Biggers, Larry Dowdell, Melvin Griffin, and Reginal Richardson. Defs.' App. of Docs. in Supp. of Mots. for Summ. J. Ex. 3, Mem. from K. Latham to G. Wylie 1 (Mar. 8, 1993), ECF No. 98-3 [hereinafter 1993 Latham Mem.]. At Latham's prompting, the School District

wrote a letter to the TRS requesting admission for several employees. That letter contained the employees' actual job titles and stated that the employees were "employed in positions which encompass supervisory responsibilities." Defs.' App. of Docs. in Supp. of Mots. for Summ. J. Ex. 7, Letter from G. Wylie to P. Rodgers (May 28, 1993), ECF No. 98-7 [hereinafter 1993 Wylie Letter to TRS]. The TRS rejected the School District's request, finding that it did not appear that any of the employees were eligible for TRS membership. Defs.' App. of Docs. in Supp. of Mots. for Summ. J. Ex. 6, Letter from P. Rodgers to G. Wylie (July 8, 1993), ECF No. 98-6 [hereinafter 1993 Letter from Rodgers/TRS].

B.   Godfrey Biggers

Plaintiff Godfrey Biggers ("Biggers") began his employment with the School District in 1960, and he retired in 2003. During his tenure with the School District, Biggers worked as a masonry mechanic. 1993 Wylie Letter to TRS. Biggers asserts that his position encompassed some supervisory responsibilities because he sometimes supervised the work of other employees. *See* Latham Dep. 97:10-98:8 (stating that if Biggers and Plaintiff William Marshall went on a bricklaying job, Biggers was in charge, but if Biggers and Marshall went on a concrete job, Marshall was in charge); *see also* 1993 Wylie Letter to TRS (stating that Biggers was employed in a position that

"encompass[ed] supervisory responsibilities."); Defs.' App. of
Docs. in Supp. of Mots. for Summ. J. Ex. 4 at 1, Note from L.
Bell, ECF No. 98-4 at 1 ("When Godfrey Biggers and Daryl Shealy
are working together, Godfrey supervises Daryl.").[4]  Biggers is a
member of the PSERS.   It is undisputed that Biggers was never
permitted to join the TRS.

When Latham became the School District's director of plant
services in 1974, Biggers asked Latham about becoming a member
of the TRS.   Biggers Dep. 31:17-25, ECF No. 88-3.   At first,
according to Biggers, Latham responded that he would "get back
with [him]."   Biggers Dep. 33:10-14; *accord id.* at 34:17-21
(quoting Latham as saying, "We'll have to get back with y'all
later" on TRS membership).   As discussed above, in 1993, Latham
did try to help Biggers join the TRS.   Latham wrote a memorandum
to George Wylie in the School District's personnel department on
behalf of Biggers and several other employees.   1993 Latham Mem.
Wylie, in turn, wrote a letter to the TRS on behalf of Biggers
and several other employees, asking the TRS to consider the
employees for membership.   1993 Wylie Letter to TRS.   The TRS,

---

[4] According to Defendants, Biggers admitted in a 2007 deposition that
he did not have supervisory authority over anyone and that he was not
aware of any other individuals in his position that were members of
the TRS.   Defs.' Resp. to Pls.' Statement of Material and Undisputed
Facts ¶¶ 584-90, ECF No. 124.   Based on the Court's review of
Defendants' filings—including Defendants' appendices of documents and
Defendants' exhibits attached to their summary judgment briefs and
response briefs—Defendants did not submit a copy of the 2007
deposition.   The Court therefore cannot consider it.

however, rejected Wylie's requests, finding that the employees, including Biggers, were not eligible for TRS membership.  1993 Letter from Rodgers/TRS.

It is undisputed that Biggers believed as far back as the 1980s that he was not permitted to join the TRS because of his race.  When asked in his deposition whether he thought it was because of his race that he did not become a member of the TRS, he testified:

> Well, I wouldn't say it was a racial thing.  But I would say it like this here: They never did put a black man on Teachers' Retirement. Now, what now, a Caucasian will come in there, they put them on Teachers' Retirement time he get in there and sign his John Henry. Well, why couldn't he do us like that? I don't see no difference.
>
> * * *
>
> I think it was -- everything was unfair about me because I was a brick  mason there and I didn't get my fair share there. Wasn't getting it when I left there [in 2003]. And everything just went sour with me because we were black people.

Biggers Dep. 32:6-12, 19-23.  Given that it is undisputed that Biggers believed in the 1980s that the School District did not permit him to join the TRS because of his race, Biggers's § 1981 claim accrued before July 13, 2006, and his § 1983 claim accrued before July 13, 2008, and both claims are untimely.  Defendants are thus entitled to summary judgment on Biggers's § 1981 and § 1983 claims.

C.   Carlton Brantley

Plaintiff Carlton Brantley ("Brantley") began working for the School District in May 1999.  He was hired as a masonry mechanic II.[5]  Brantley Dep. 14:8-9, Oct. 31, 2007, ECF No. 98-93 [hereinafter Brantley Oct. 2007 Dep.].[6]  As a masonry mechanic, Brantley performs general maintenance work, such as fixing bricks that are out of order and filling holes in cement.  *Id.* at 13:15-24.  It is undisputed that Brantley is not responsible for hiring, firing, evaluating or supervising other employees.  Brantley has admitted that he does not do supervisory work.  *Id.* at 15:7-11.  Nonetheless, Brantley asserts that his position encompasses some supervisory responsibilities because he "supervises" various tools, such as a wheelbarrow, a hoe, a shovel, a cutting machine, a demolition hammer, a jackhammer,

---

[5] In his first response to Defendants' Statement of Undisputed Material Facts, Brantley did not dispute this fact.  Pl. Brantley's Resp. to Defs.' Statement of Undisputed Material Facts ¶ 2, ECF No. 130-6.  In his supplemental response to Defendants' Statement of Undisputed Material facts, Brantley changed his answer, arguing that he was a supervisor in the masonry mechanic department because he "supervised tools, tasks, machine, jackhammer, trowel, etc."  Pl. Brantley's Supplemental Resp. to Defs.' Statement of Undisputed Material Facts ¶ 2, ECF No. 139-12.  This assertion does not change the fact that Brantley's title was masonry mechanic II, as he admitted in his 2007 deposition and in the Complaint.  Brantley Dep. 14:8-9, Oct. 31, 2007, ECF No. 98-93; 2d Am. Compl. ¶ 463, ECF No. 53.

[6] Brantley contends that he is unable to respond to certain fact statements based on Brantley's April and October 2007 depositions because Defendants did not produce the depositions during discovery.  *E.g.,* Pl. Brantley's Resp. to Defs.' Statement of Undisputed Material Facts ¶¶ 11, 67, ECF No. 139-12.  Defendants did, however, file the depositions as exhibits 93 and 94 in support of their summary judgment motions, so the Court cannot conclude that Brantley had no opportunity to review them.

and a trowel machine.  Brantley Dep. 88:19-24, Oct. 31, 2011, ECF No. 104-3 [hereinafter Brantley 2011 Dep.].  Brantley is a member of the PSERS.  It is undisputed that Brantley has not been permitted to join the TRS.  It is also undisputed that Brantley is unaware of any masonry mechanic II or masonry mechanic III who is a member of the TRS.

Brantley first learned about the TRS during his orientation in 1999.  Brantley Oct. 2007 Dep. 15:12-16:2.  Brantley asked to become a member of the TRS, but the woman who was conducting the orientation told Brantley that he was qualified for the PSERS, not the TRS.  *Id.* at 16:3-23.  Brantley contends that he did not discover that he might be considered a "supervisor" for TRS purposes (under Latham's incorrect definition) until "April 2009 when Kinard Latham said a man could supervise one man, he could be over a machine or a tool or any specific task [and be eligible for TRS membership]."  Brantley 2011 Dep. 87:13-88:19.  There is, however, evidence that Brantley believed well before April 2009 that he was eligible for the TRS but was not permitted to join the TRS because of his race.  First, in his response to the School District's interrogatories in a prior action Brantley brought in this Court, Brantley stated:

> In May 1999, while being oriented at The Claflin
> School for employee benefits and signed-up, I was
> joined with another employee that drive the Book
> Mobile.  During the session, he was offered the
> Teacher's Retirement Fund; I was offered the Public

> Retirement benefit fund. I questioned this several
> times to the lady that was assisting us, but I never
> received a direct answer from her. She would only
> state that I did not qualify for the TRS. I recently
> learned that the TRS fund was set up some 40 years ago
> for individuals who held supervisory positions. This
> system has historically benefited whites.

Defs.' App. of Docs. in Resp. to Pls.' Mot. for Summ. J. Ex. 103, Pl. Brantley's Answers to Defs.' 1st Interrogs. 4, ECF No. 126-3 at 4. The interrogatory responses are dated February 28, 2007. *Id.* at 17. Second, Brantley is one of the School District employees who filed suit against the School District in June of 2007, alleging that the School District discriminated against the plaintiffs in the administration of TRS eligibility. *See* Defs.' App. of Docs. in Supp. of Mots. for Summ. J. Ex. 1, Compl. ¶¶ 21-22, *Brantley v. Muscogee Cnty. Sch. Dist.*, SU07CV1558-05 (June 6, 2007), ECF No. 98-1 [hereinafter 2007 Compl.]; *accord* Defs.' App. of Docs. in Supp. of Mots. for Summ. J. Ex. 2, Press Release, Whitaker & Whitaker, P.C. (Nov. 15, 2007), ECF No. 98-2 [hereinafter Whitaker Press Release]. Finally, Brantley complained to former plant services director James Tanksley in early 2007 that he was not permitted to join the TRS but fellow employee Bubba Amon was, even though Amon was not a supervisor. Brantley 2011 Dep. 84:24-85:16 (testifying that Brantley referenced Tanksley's February 2007 memorandum regarding TRS qualifications during his discussion with Tanksley).

Based on this evidence, Brantley cannot seriously dispute that he believed in 2007, when he complained to Tanksley and later joined the state court lawsuit against the School District, that the School District was discriminating against black employees with regard to TRS membership. Therefore, his § 1983 claim accrued before July 13, 2008, and the claim is untimely. Brantley's § 1981 and Title VII claims will be evaluated on the merits.

D. Henry Crawford

Plaintiff Henry Crawford ("Crawford") began working for the School District in 1976. When he started, Crawford was a helper on a truck in the School District's warehouse. Crawford Dep. 12:25-13:9, ECF No. 90-3. Crawford later became a forklift operator in the warehouse. *Id.* at 14:3-22. Crawford spends most of his time at work operating the forklift, and he is also responsible for pulling orders and for cleaning the restroom on Fridays. *Id.* at 15:6-16:4. Crawford has never applied for another position with the School District, such as warehouse supervisor. *Id.* at 14:23-15:5. Crawford asserts that his position encompasses some supervisory responsibilities because he "supervises" various tools and machines, including a forklift, a pallet jack, and a handtruck.

It is undisputed that Crawford has not been permitted to join the TRS. In fact, when Crawford asked Latham to get him

into the TRS, Latham told him no.  *Id.* at 17:10-20.  It is undisputed that Crawford believed during Latham's tenure as plant services director, which ended in 1996, that Crawford was not permitted to join the TRS because of his race.  *Id.* at 34:19-35:16.  Therefore, Crawford's § 1981 claim accrued before July 13, 2006, and his § 1983 claim accrued before July 13, 2008.  Accordingly, both claims are untimely, and Defendants are entitled to summary judgment on Crawford's § 1981 and § 1983 claims.

### E.   Larry Dowdell

Plaintiff Larry Dowdell ("Dowdell") joined the School District in 1980.  His current job title is masonry mechanic III.  Dowdell Dep. 9:24-25, ECF No. 91-3.  Dowdell has never applied for a leaderman or supervisor position.  *Id.* at 89:3-8. Dowdell asserts that his position encompasses some supervisory responsibilities because he sometimes supervises the work of other individuals.  *Id.* at 89:9-12; *see also* 1993 Wylie Letter to TRS (stating that Dowdell was employed in a position that "encompass[ed] supervisory responsibilities."); Dowdell Dep. 92:11-94:18 (listing individuals whose work Dowdell has supervised).[7]  It is undisputed that Dowdell is a member of the PSERS and that he has not been permitted to join the TRS.

---

[7] According to Defendants, Dowdell admitted in a 2007 deposition that he was not aware of any other individuals with his job duties that were members of the TRS.  Defs.' Resp. to Pls.' Statement of

In 1986, Dowdell attended a meeting regarding the TRS.  At the meeting, Latham stated that an employee could "be over wheelbarrows, lawn -- or any kind of equipment, any kind of tool, or manage one person, and . . . get in that Teachers' Retirement."  Dowdell Dep. 48:6-16.  After that meeting, Dowdell asked Latham to help him enroll in the TRS, but Latham said no. *Id.* at 89:24-90:13.  After that, Dowdell repeatedly asked Latham about becoming a member of the TRS.  Latham "always" told Dowdell that he would "get back with" him.  *Id.* at 15:10-16:1; 89:24-90:18.

As discussed above, in 1993, Latham did try to help Dowdell join the TRS.  Latham wrote a memorandum to George Wylie in the School District's personnel department on behalf of Dowdell and several other employees.  1993 Latham Mem.  Wylie, in turn, wrote a letter to the TRS on behalf of the employees, asking the TRS to consider the employees for membership.  1993 Wylie Letter to TRS.  The TRS, however, rejected Wylie's requests, finding that the employees were not eligible for TRS membership.  1993 Letter from Rodgers/TRS.

It is undisputed that Dowdell believed during Latham's tenure, which ended in 1996, that the School District did not

---

Undisputed Material Facts ¶ 172, ECF No. 124.  Based on the Court's review of Defendants' filings—including Defendants' appendices of documents and Defendants' exhibits attached to their summary judgment briefs and response briefs—Defendants did not submit a copy of the 2007 deposition.  The Court therefore cannot consider it.

permit him to join the TRS because of his race.   Dowdell Dep.
57:10-14.   Therefore, Dowdell's § 1981 claim accrued before July
13, 2006, and his § 1983 claim accrued before July 13, 2008.
Accordingly, both claims are untimely, and Defendants are
entitled to summary judgment on Dowdell's § 1981 and § 1983
claims.

 F. <u>Melvin Griffin</u>

 Plaintiff Melvin Griffin ("Griffin") began working for the
School District in 1976.   When he was first hired, Griffin's
title was grounds laborer, though Griffin performed the duties
of a tractor drive; in 2001, Griffin officially became a tractor
driver.   Griffin Dep. 39:25-40:11, 41:4-13, ECF No. 94-3.   It is
undisputed that Griffin never applied for a promotion and that
he never applied to be crew chief or leaderman.   Griffin asserts
that his position encompasses some supervisory responsibilities.
*See* 1993 Wylie Letter to TRS (stating that Griffin was employed
in   a   position   that   "encompass[ed]   supervisory
responsibilities."); Defs.' App. of Docs. in Supp. of Mots. for
Summ. J. Ex. 4 at 9, Note from M.H., ECF No. 98-4 at 9 ("Melvin
Griffin is in charge of the tractors, and also two workers.").
It is undisputed that Griffin is a member of the PSERS and that
he has not been permitted to join the TRS.

 Griffin attended a meeting regarding the TRS during
Latham's tenure as plant services director.   Griffin Dep. 11:23-

12:4.  At the meeting, Latham stated that an employee had to be a supervisor of a person or a piece of equipment to be eligible for the TRS.  *Id.* at 11:23-13:2.  Several years later, Griffin told Latham that he wanted to enroll in the TRS.  *Id.* at 14:21-15:8.  As discussed above, in 1993, Latham tried to help Griffin join the TRS.  Latham wrote a memorandum to George Wylie in the School District's personnel department on behalf of Griffin and several other employees.  1993 Latham Mem.  Wylie, in turn, wrote a letter to the TRS on behalf of Griffin and several other employees, asking the TRS to consider the employees for membership.  1993 Wylie Letter to TRS.  The TRS, however, rejected Wylie's requests, finding that the employees were not eligible for TRS membership.  1993 Letter from Rodgers/TRS.

When Latham received the response from TRS, he informed Griffin that the TRS had turned down Griffin's request to enroll.  Griffin Dep. 15:9-15.  It is undisputed that Griffin believed when his TRS request was rejected in 1993 that the request was rejected because of Griffin's race.  *Id.* at 35:5-23.  Therefore, Griffin's § 1981 claim accrued before July 13, 2006, and his § 1983 claim accrued before July 13, 2008, and both claims are untimely.  For these reasons, Defendants are entitled to summary judgment on Griffin's § 1981 and § 1983 claims.

G.   Pondiel Mabry

Plaintiff Pondiel Mabry ("Mabry") joined the School District as a custodian in 1987. He became a security guard in 1996. In 2004, Mabry joined the plant services department as a roofer. According to Mabry's colleague, Plaintiff Calvin Williams, who is also a roofer, most of Mabry's time at work is spent doing physical labor. Williams Dep. 24:2-10, ECF No. 103-3. Mabry contends that he became eligible for TRS in 2004 when he took the roofer position because his job encompasses some supervisory responsibilities. Though Mabry has not applied for a leaderman position, he testified that he supervises Williams and has been appointed "second in charge" to the leaderman, Tony Dent. Mabry Dep. 86:9-88:11, ECF No. 89-3. It is undisputed that Mabry is a member of PSERS and that he has never been permitted to join the TRS.

Mabry was aware of the TRS issue as early as 1998, when he attended an NAACP meeting about the issue and told Plaintiff Patrick Stroud that the NAACP could help both of them with TRS. Stroud Dep. 78:21-79:21, ECF No. 92-3. It is undisputed that once he joined plant services, Mabry began requesting TRS membership. In February 2007, Mabry received a memorandum from James Tanksley explaining that non-supervisory employees were not eligible for TRS membership. Mabry Dep. 15:15-20; *see also*

Cooper Dep. Ex. 39, Mem. from J. Tanksley to All Plant Services Employees (Feb. 19, 2007), ECF No. 98-97 at 289.

Mabry is one of the School District employees who filed suit against the School District in June of 2007, alleging that the School District discriminated against the plaintiffs in the administration of TRS eligibility. *See generally* 2007 Compl.; Whitaker Press Release. It is undisputed that Mabry believed in 2007, when he joined the lawsuit against the School District, that the School District was discriminating against black employees with regard to TRS membership. Therefore, Mabry's § 1983 claim accrued before July 13, 2008, and the claim is untimely. Accordingly, Defendants are entitled to summary judgment on Mabry's § 1983 claim. Based on the present record, Mabry's § 1981 claim is timely, and the Court will evaluate that claim on the merits.

H.   William Marshall

Plaintiff William Marshall ("Marshall") was employed by the School District as a plasterer from 1960 until he retired in 2002. Marshall asserts that his position encompassed some supervisory responsibilities. *See* Latham Dep. 97:10-98:8 (stating that if Marshall and Biggers went on a bricklaying job, Biggers was in charge, but if Biggers and Marshall went on a concrete job, Marshall was in charge). It is undisputed that

Marshall is a member of the PSERS and that he was never permitted to join the TRS.

While Latham was director of plant services, Marshall asked Latham several times about joining the TRS.  Marshall Dep. 25:2-26:11, 28:3-21, ECF No. 96-3.  Each time, Latham responded that he would "get back with" Marshall.  *Id.*  It is undisputed that Marshall believed during Latham's tenure that the School District did not permit Marshall to enroll in the TRS because of his race.  *Id.* at 28:3-10, 29:13-30:3.  Therefore, Marshall's § 1981 claim accrued before July 13, 2006, and his § 1983 claim accrued before July 13, 2008.  Accordingly, both claims are untimely, and Defendants are entitled to summary judgment on Marshall's § 1981 and § 1983 claims.

I.   Connie McCoy

Plaintiff Connie McCoy has been employed by the School District since 1972.  McCoy works at the public library, not at a school building, and her supervisor is the director of public libraries.  Muller Aff. ¶¶ 2-3, ECF No. 98-78; Stansell Aff. ¶¶ 7-9, ECF No. 126-17 (stating that library custodians are supervised and evaluated by library staff and not by plant services staff).

McCoy alleged in the Complaint that she "has performed the duties of a Head Custodian" since 1978.  2d Am. Compl. ¶ 58, ECF

No. 53.  McCoy testified in her deposition, however, that her official job title is "supervisor":

Q. Now, you are a head custodian?

* * *

A.   I'm a supervisor.

Q. What is your official title?

A.   I'm a supervisor.

Q. What is the title on your job description?

* * *

A. On my job description?

Q.   Yes.

A. A supervisor.

Q. Okay. Were you ever a head custodian?

A. Lady, excuse me. I was a supervisor.

Q. Okay. Did you ever have the job title of head custodian?

A.   Not that I know of.

McCoy Dep. 28:9-29:4, ECF No. 99-3.  McCoy cannot seriously dispute that she is a custodial supervisor.  *Id.* at 40:17-21; McCoy Dep. Pl.'s Ex. 2, Emergency Call List, ECF No. 99-3 at 20 (listing C. McCoy as "Custodial Supervisor").  There is no evidence that any public library custodian, supervisor or not, is enrolled in the TRS.[8]  Muller Aff. ¶ 5; Stansell Aff. ¶ 11.

---

[8] In her first response to Defendants' Statement of Undisputed Material Facts, McCoy did not dispute that there are no public library custodians enrolled in the TRS.  Pl. McCoy's Resp. to Defs.' Statement

McCoy asked her supervisor, Gary Wortley, if she could join the TRS. McCoy Dep. 15:14-17. She received a response letter in 2007 stating that she was not qualified for the TRS and that she "didn't hire or fire." *Id.* at 14:11-17:4.

McCoy is one of the School District employees who filed suit against the School District in June of 2007, alleging that the School District discriminated against the plaintiffs in the administration of TRS eligibility.[9] *See generally* 2007 Compl.; Whitaker Press Release. It is undisputed that McCoy believed in 2007, when she joined the lawsuit against the School District, that the School District was discriminating against black employees with regard to TRS membership. Therefore, McCoy's § 1983 claim accrued before July 13, 2008, and the claim is untimely. Accordingly, Defendants are entitled to summary judgment on McCoy's § 1983 claim based on the statute of

---

of Undisputed Material Facts ¶ 1, ECF No. 130-10. McCoy now contends that Curtis Dukes is (1) responsible for custodial services at the public libraries and (2) enrolled in the TRS. Pl. McCoy's Supplemental Resp. to Defs.' Statement of Undisputed Material Facts ¶ 1, ECF No. 139-4. McCoy, however, did not provide any citations to the record in support of either assertion, so the Court need not consider them.

[9] According to Defendants, McCoy testified in a 2007 deposition that was aware that the School District was racially discriminating regarding TRS in October 2006 and was unaware of any School District custodian who was a member of the TRS. Defs.' Resp. to Pls.' Statement of Undisputed Material Facts ¶¶ 265-66, ECF No. 124. Based on the Court's review of Defendants' filings—including Defendants' appendices of documents and Defendants' exhibits attached to their summary judgment briefs and response briefs—Defendants did not submit a copy of the 2007 deposition. The Court therefore cannot consider it.

limitations.   Based on the present record, McCoy's § 1981 claim
is timely, and the Court will evaluate that claim on the merits.

        J.   Hayward Parham

        Plaintiff Hayward Parham ("Parham") began working for the
School District as a school custodian in 1971.   Parham became
lead custodian in 1977, although his title has changed over the
years and has included "head custodian," "custodian III," and
"coordinator."   Parham Dep. 10:11-11:4, 21:12-24, 32:4-8, ECF
No. 100-3.   Since 1977, Parham has performed custodial work and
also supervised other custodians.   It is undisputed that Parham
is a member of the PSERS and that he has never been permitted to
join the TRS.

        Parham is one of the School District employees who filed
suit against the School District in June of 2007, alleging that
the School District discriminated against the plaintiffs in the
administration of TRS eligibility.[10]   Defs.' App. of Docs. in
Supp. of Mots. for Summ. J. Ex. 82, Mot. for Leave to Amend
¶¶ 1, ECF No. 98-82; see also Whitaker Press Release.

_____

[10] According to Defendants, Parham testified in a 2007 deposition that
he believed in 2004 that the School District was racially
discriminating regarding TRS.   Defs.' Resp. to Pls.' Statement of
Undisputed Material Facts ¶ 308, ECF No. 124.   Defendants also assert
that Parham testified that the principal of his school assigns
specific areas for each custodian to clean and that he is not aware of
any custodian, including a head custodian, who is a TRS member.   Id.
¶¶ 301, 305-306.   Based on the Court's review of Defendants' filings—
including Defendants' appendices of documents and Defendants' exhibits
attached to their summary judgment briefs and response briefs—
Defendants did not submit a copy of the 2007 deposition.   The Court
therefore cannot consider it.

It is undisputed that Parham believed in 2007, when he joined the lawsuit against the School District, that the School District was discriminating against black employees with regard to TRS membership. Therefore, Parham's § 1983 claim accrued before July 13, 2008, and the claim is untimely. Accordingly, Defendants are entitled to summary judgment on Parham's § 1983 claim. Based on the present record, Parham's § 1981 claim is timely, and therefore, the Court will evaluate that claim on the merits.

### K.   Reginal Richardson

Plaintiff Reginal Richardson ("Richardson") began working for the School District in 1982. He worked in the food services warehouse for approximately two years, and then he moved to the maintenance department and became a roofer. Richardson Dep. 17:11-24, 18:20-25, Apr. 17, 2007, ECF No. 98-95 [hereinafter Richardson 2007 Dep.].[11] As a roofer, Richardson was responsible for maintaining and repairing roofs and gutters. *Id.* at 20:24-21:3. In 1996 or 1997, Richardson became an assistant leaderman, but he relinquished that position because he "felt it was too much responsibility." *Id.* at 19:1-21. Richardson also

---

[11] Richardson contends that he is unable to respond to certain fact statements. *E.g.*, Pl. Richardson's Resp. to Defs.' Statement of Undisputed Material Facts ¶¶ 43-44, 47-69, 72-73, ECF No. 139-11. Richardson does not explain why he cannot respond to these facts, which are supported by his April 2007 deposition. Defendants filed the deposition as exhibit 95 in support of their summary judgment motion, so the Court cannot conclude that Richardson had no opportunity to review it.

testified that he served as leaderman during the 1990s after Defendant Thomas Shellnutt was suspended from the leaderman position. Richardson Dep. 70:22-71:17; 87:18-88:10, Nov. 1, 2011, ECF No. 95-3 [hereinafter Richardson 2011 Dep.]. When Shellnutt returned to work, Richardson was no longer leaderman. *Id.* at 89:21-90:7. Richardson was terminated from his job in August of 2004. Richardson was a member of the PSERS, and it is undisputed that he was never permitted to join the TRS.

Richardson asserts that he should have been placed in the TRS when he served as assistant leaderman and interim leaderman during the 1990s. Richardson also contends that his roofer position encompassed some supervisory responsibilities because he sometimes supervised other employees. 1993 Latham Mem. 1 (stating that he had a signed statement from the employees' "supervisor indicating that they do oversee other employees that work under them); *accord* Defs.' App. of Docs. in Supp. of Mots. for Summ. J. Ex. 4 at 2, Note from L. Bell, ECF No. 98-4 at 2 (stating, "Reginal Richardson supervises Greg Whiting and Thomas Griffin in the Roofing Department in the absence of Anthony Dent"); *see also* Defs.' App. of Docs. in Supp. of Mots. for Summ. J. Ex. 7, 1993 Wylie Letter to TRS (stating that Richardson was employed in a position that "encompass[ed] supervisory responsibilities.").

31

As discussed above, in 1993, Latham did try to help Richardson join the TRS. Latham wrote a memorandum to George Wylie in the School District's personnel department on behalf of Biggers and several other employees. 1993 Latham Mem. Wylie, in turn, wrote a letter to the TRS on behalf of Richardson and several other employees, asking the TRS to consider the employees for membership. 1993 Wylie Letter to TRS. The TRS, however, rejected Wylie's requests, finding that the employees were not eligible for TRS membership. 1993 Letter from Rodgers/TRS.

Richardson believed as far back as 2000 that he was not permitted to join the TRS because of his race. Richardson 2007 Dep. 26:2-27:19. This belief was based on Richardson's request to join the TRS while he was serving as assistant leaderman. *Id.* Richardson's supervisor, Rocky Jones, told him that he was not qualified. *Id.* Richardson told Jones at that time that he believed the denial of his TRS request was discriminatory. *Id.* Therefore, Richardson's § 1981 claim accrued before July 13, 2006, and his § 1983 claim accrued before July 13, 2008, and both claims are untimely. Defendants are therefore entitled to summary judgment on Richardson's § 1981 and § 1983 claims.

L.   Jerry Starks

Plaintiff Jerry Starks ("Starks") has been employed by the School District since 1992. Starks has worked on a grounds crew

since he began with the School District, and he contends that he has had the responsibilities of a crew chief since he started with the School District in 1992. Starks was officially promoted to crew chief in 2007, and it is undisputed that Starks enrolled in the TRS in March 2008. Prior to March 2008, Starks was a member of the PSERS. It is undisputed that Starks has had no problems with the School District regarding the TRS since he was able to join the TRS in March 2008.

In 1993, Starks attended a meeting during which Latham said that everyone "over a wheelbarrow should get in TRS." Starks Dep. 24:4-8, ECF No. 93-3. Therefore, Starks contends that he should have been permitted to enroll in the TRS when he began performing the responsibilities of crew chief in 1992. Starks asked to be enrolled in the TRS a number of times over the years. When Starks was hired, Starks believed that Latham "was going to hook [him] up" with the TRS because Latham had been Starks's principal at Daniel Junior High. *Id.* at 21:6-15. According to Starks, Latham told French to give Starks a TRS application. *Id.* at 21:6-25. French gave Starks a TRS application and then said she had given him the wrong application. *Id.* Starks replied that he wanted to be in the TRS, and French asked, "Well, are you a teacher?" *Id.* at 21:16-22. Starks replied no, so French gave him an application for the PSERS. *Id.* When Starks told Latham that French had not

given him a TRS application, Latham asked Starks to give him six months and he would get Starks into the TRS. *Id.* at 21:23-22:2. When Starks asked Latham again about joining the TRS, Latham told Starks that he had to be a leaderman or supervisor. *Id.* at 23:4-20. Starks pointed out to Latham that he was the nighttime supervisor at Hardaway High School and asked whether that position met the TRS criteria. *Id.* at 23:12-15. Latham responded, "just give me some time." *Id.* at 23:16-18. By the time Latham retired in 1996, Starks knew that Latham was not going to get Starks enrolled in the TRS. *Id.* at 27:18-21.

Starks spoke with Guy Sims, who served as the School District's superintendent from 1997 to 2001, about getting on the TRS. *Id.* at 29:23-25. Sims told Starks that there was nothing he could do and that Starks would have to go through his supervisor for TRS enrollment. *Id.* at 30:17-25.

Starks also spoke with Leon Bell during Bell's tenure as personnel director (1997 to 2000) regarding the TRS. Bell told Starks that if his direct supervisor, Dale Parks, did not recommend him for the TRS, then there was nothing Bell could do about it. *Id.* at 31:9-32:6. Starks approached Bell again to ask if Bell would speak with Parks on his behalf, and Bell said he did not have time. *Id.* at 32:23-33:15.

Sometime during David Jackson's tenure as personnel director (1995 to 2003), Starks spoke with Jackson about getting

on the TRS. *Id.* at 14:17-24. Starks explained that Craig Farrell, a white employee, was on the TRS. *Id.* at 15:2-7. Starks also explained that he had supervisor duties and asked why he could not enroll in the TRS. *Id.* Starks told Jackson that he "deserve[d] something." *Id.* In response, Jackson approved a "25 cent raise" for Starks. *Id.* at 15:8-10.

It is undisputed that Starks learned in 2001 that Farrell, a white employee, was on the TRS. According to Starks, Farrell was a tractor mechanic who did not supervise any employees in 2001. It is also undisputed that Starks believed in 2001 that Farrell was permitted to join the TRS because he was white and Starks was denied TRS enrollment because he was black. *Id.* at 17:4-20. Therefore, Starks's § 1981 claim accrued before July 13, 2006, and his § 1983 claim accrued before July 13, 2008. Accordingly, both claims are untimely, and Defendants are entitled to summary judgment on Starks's § 1981 and § 1983 claims.

M. Patrick Stroud

Plaintiff Patrick Stroud ("Stroud") joined the School District as an electrician in 1990.[12] Stroud Dep. 16:6-12, ECF

---

[12] In his first response to Defendants' Statement of Undisputed Material Facts, Stroud did not dispute this fact. Pl. Stroud's Resp. to Defs.' Statement of Undisputed Material Facts ¶ 18, ECF No. 131-1. In his supplemental response to Defendants' Statement of Undisputed Material facts, Stroud changed his answer, arguing that Stroud received the job of "Supervisor." Pl. Stroud's Supplemental Resp. to Defs.' Statement of Undisputed Material Facts ¶ 18, ECF No. 139-7. In

No. 92-3.   Stroud is now an electrician III, and he does "industrial type work," which includes "high mode voltage, installing receptacles, adding circuits, replacing lighting, dealing with more of a high voltage area, like adding panel boxes, stuff like that." *Id.* at 80:12-18.   Stroud spends 100% of his workday doing this type of work. *Id.* at 81:3-8.   Stroud asserts that his position encompasses some supervisory responsibilities because he supervised his truck and tools.   It is undisputed that Stroud is a member of the PSERS and that he has not been permitted to join the TRS.

In 1990, Stroud asked French about joining the TRS, and French referred him to the plant services director and told him that the TRS was open to supervisors. *Id.* at 31:3-16, 33:9-17. In 1990, Latham told Stroud that he had to be a supervisor to become a member of the TRS and that a supervisor could be somebody who "supervised" a truck and tools.   *Id.* at 59:9-14. It is not clear from the evidence cited by the parties whether Stroud asked Latham if he could help Stroud join the TRS.   When Leon Bell became director of plant services, Stroud told Bell

---

support of this assertion, Stroud cites testimony of Myles Caggins. Plaintiffs list the deposition of Mr. Caggins as Exhibit 87 in support of their Reply Brief.   Reply Exhibit List, ECF No. 188-1.   Plaintiffs did not, however, file an Exhibit 87 with their Reply Brief, so the Court cannot verify Caggins's testimony. Even if Plaintiffs had submitted the deposition of Caggins, they represent that he testified that tradespeople exercise independent judgment as to particular tasks.   Such testimony would not change the fact that Stroud's title was electrician, as he stated in his deposition.   Stroud Dep. 16:6-12.

that other individuals in his position were members of the TRS, and Stroud asked if he could join the TRS. *Id.* at 37:9-15. Bell told Stroud that he could not help Stroud enroll in the TRS because the TRS was only open to supervisors. *Id.*

Stroud knew that certain white employees who did not have a title of supervisor were permitted to join the TRS, and he believed that it was unfair that he, as a black employee, was not permitted to join the TRS. *Id.* at 43:8-13. Stroud knew about this issue while Latham was still plant services director, and Stroud raised these concerns to Leon Bell in approximately 1996. *Id.* at 38:14-17, 42:16-22. He also raised the issue to an assistant superintendent named Mr. Griffin in 1995 or 1996. *Id.* at 45:19-46:13.

Based on the undisputed evidence, Stroud believed by 1996 that the School District did not permit him to join the TRS because of his race. Therefore, Stroud's § 1981 claim accrued before July 13, 2006, and his § 1983 claim accrued before July 13, 2008. Accordingly, both claims are untimely, and Defendants are entitled to summary judgment on Stroud's § 1981 and § 1983 claims.

N.   <u>Larry Thompson</u>

Plaintiff Larry Thompson ("Thompson") worked for the School District from 1986 until 2009. Thompson worked as a custodian. *See* Thompson Dep. 24:16-18, ECF No. 123-14 (when asked whether

37

Thompson could do his regular job as a custodian after an injury, Thompson said no). Thompson contends that he was a lead custodian, though he did not point to any evidence on this point.[13] It is undisputed that Thompson was a member of the PSERS and was never permitted to join the TRS.

Thompson is one of the School District employees who filed suit against the School District in June of 2007, alleging that the School District discriminated against the plaintiffs in the administration of TRS eligibility. *See generally* 2007 Compl.; Whitaker Press Release. The 2007 Complaint alleged that the plaintiffs, "directly and through counsel on their behalf, have made numerous inquiries over a substantial period of time in order to determine any valid reason for their omission from the [TRS]." 2007 Compl. ¶ 24.

It is undisputed that Thompson believed in 2007, when he joined the lawsuit against the School District, that the School District was discriminating against black employees with regard to TRS membership. Therefore, Thompson's § 1983 claim accrued before July 13, 2008, and the claim is untimely. Accordingly, Defendants are entitled to summary judgment on Thompson's § 1983

---

[13] According to Defendants, Thompson testified about his job duties as a custodian during a 2007 deposition. Defs.' Resp. to Pls.' Statement of Undisputed Material Facts ¶¶ 481-504, ECF No. 124. Based on the Court's review of Defendants' filings—including Defendants' appendices of documents and Defendants' exhibits attached to their summary judgment briefs and response briefs—Defendants did not submit a copy of the 2007 deposition. The Court therefore cannot consider it.

claim.   Based on the present record, Thompson's § 1981 claim is timely, and the Court will evaluate that claim on the merits.

O.   Calvin Williams

Plaintiff Calvin Williams ("Williams") began working for the School District as a custodian in 1980.  In 1984 or 1985, Williams became head custodian at Eastway Elementary School. Williams Dep. 21:21-22:9, ECF No. 103-3.  Williams held that job until 2006, when he applied for and received the job of roofer.[14] *Id.* at 22:7-9, 23:8-17.  As a roofer, Williams's job is to do "patch work, clean gutters, down pipes, spud gravel, a lot of caulking and shingles, modified rubber. You know, stuff like that."  *Id.* at 23:18-23.  It is undisputed that the majority of Williams's time as a roofer is spent doing physical labor.

Williams asserts that his custodial position encompassed supervisory responsibilities because he supervised three people and also machines and tools.  *Id.* at 24:16-25:5.  It is

---

[14]  In his first response to Defendants' Statement of Undisputed Material Facts, Williams did not dispute this fact.  Pl. Williams's Resp. to Defs.' Statement of Undisputed Material Facts ¶ 21, ECF No. 130-5.  In his supplemental response to Defendants' Statement of Undisputed Material facts, Williams changed his answer, arguing that Williams received the job of "Roofer/Supervisor."  Pl. Williams's Supplemental Resp. to Defs.' Statement of Undisputed Material Facts ¶ 21, ECF No. 139-10.  In support of this assertion, Williams cites testimony of Myles Caggins that roofers exercise independent judgment as to particular tasks.  Plaintiffs list the deposition of Mr. Caggins as Exhibit 87 in support of their Reply Brief.  Reply Ex. List, ECF No. 188-1.  Plaintiffs did not, however, file an Exhibit 87 with their Reply Brief, so the Court cannot verify Caggins's testimony. Even if Plaintiffs had submitted the deposition of Caggins, his testimony that roofers exercise independent judgment as to certain tasks would not change the fact that Williams's title was roofer, as he admitted in his deposition.  Williams Dep. 23:8-17.

undisputed that Williams is not aware of any custodians that are members of the TRS.  Williams first believed that he might be eligible to participate in the TRS when he became a roofer in 2006.  *Id.*  Williams also asserts that his roofer position is a supervisory position because it sometimes requires the exercise of independent judgment and because Williams and Mabry supervise each other.  *Id.* at 39:11-23.  Williams does not evaluate other employees.  *Id.* at 40:9-21.  Williams has not applied for a supervisor position.  *Id.* at 22:10-23:9, 24:11-15.  Williams is a member of the PSERS.  It is undisputed that he has never been permitted to join the TRS.

Defendants pointed to evidence that Williams believed in 2006 that he was eligible to join the TRS.  Defendants did not, however, point to evidence that Williams believed as of that date—or at any time before July 13, 2008—that he was not permitted to join the TRS because of his race.  Therefore, based on the present record, Williams's § 1981 and § 1983 claims are timely, and the Court will evaluate those claims on the merits.

**III. Plaintiffs' Timely Federal Claims: Analysis on the Merits**

The following federal law claims are timely and must be evaluated on the merits: Plaintiff Calvin Williams's § 1981 and § 1983 claims; the § 1981 claims of Plaintiffs Brantley, Mabry, McCoy, Parham, and Thompson; and Plaintiff Brantley's Title VII claim.  All of these claims are based on Plaintiffs' assertion

that the School District and its employees denied Plaintiffs access to the TRS while permitting similarly situated white employees to join the TRS.[15]   Defendants argue that Plaintiffs have not pointed to evidence of any intentional racial discrimination.

"In the employment context, §§ 1981 and 1983 claims require the same elements of proof and involve the same analytical framework as Title VII claims." *Bush v. Houston Cnty. Comm'n*, 414 F. App'x 264, 266 (11th Cir. 2011) (per curiam); *accord Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005) (per curiam).   Therefore, to prevail on these claims, Plaintiffs must prove that the School District intentionally discriminated against them based on their race. *Vessels*, 408 F.3d at 767.   Where, as here, a plaintiff attempts to prove

---

[15] Brantley's Title VII claims are based on his allegation that the School District denied him "equal terms and conditions of employment," failed to promote him, and deprived him "of his rights based on Race." 2d Am. Compl. ¶ 570, ECF No. 53.   The School District asserts that, other than the claim related to TRS membership, any other Title VII claims are barred because they were litigated in a prior action before the Court.   *See Brantley v. Muscogee Cnty. Sch. Dist.*, No. 4:06-CV-89 (CDL), 2008 WL 794778, at *5-*10 (Mar. 20, 2008) (granting summary judgment against Brantley on all Title VII claims), *aff'd*, 325 F. App'x 754, 754 (11th Cir. 2009) (per curiam).   Brantley did not respond to the School District's arguments on this point.   The School District also argues that any discrimination claims based on issues with Brantley's workers' compensation are barred by the exclusive remedy provisions of the Georgia Workers' Compensation Act.   Brantley did not respond to this argument, either.   Therefore, to the extent Brantley is attempting to assert Title VII claims based on grounds other than the TRS membership issue, those Title VII claims are deemed abandoned.   *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (*en banc*) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

discriminatory intent by circumstantial evidence, the courts use the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Vessels*, 408 F.3d at 767-68. Under this framework, the plaintiff must establish a prima facie case of discrimination. *Id.* at 768. Plaintiffs' claims are analogous to two typical disparate treatment claims: disparate pay and failure-to-hire. In the disparate pay context, a plaintiff may establish a prima facie case of discrimination by showing that "(1) he belongs to a protected class; (2) he received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) he was qualified to receive the higher wage." *Tucker v. Fulton Cnty., Ga.*, 470 F. App'x 832, 835 (11th Cir. 2012) (per curiam). In the failure-to-hire context, a plaintiff may establish a prima facie case of discrimination by showing that "(i) he or she belonged to a protected class; (ii) he or she was qualified for and applied for a position that the employer was seeking to fill; (iii) despite qualifications, he or she was rejected; and (iv) the position was filled with an individual outside the protected class." *Vessels*, 408 F.3d at 768. If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for its employment action. *Id.* If the employer meets this burden,

then the plaintiff must establish that each proffered reason is pretext for discrimination. *Id.*

None of the Plaintiffs pointed to evidence that they were actually eligible to join the TRS or that similarly situated white employees were permitted to join. Therefore, Defendants are entitled to summary judgment on these claims. An examination of the nature of the two retirement systems and the background of how the confusion over TRS eligibility arose makes this clear.

A.  Georgia's Public School Retirement Systems

The State of Georgia established two retirement systems for employees of the State's public schools: the TRS and the PSERS. *See* O.C.G.A. § 47-3-20 (establishing TRS); O.C.G.A. § 47-4-20 (creating PSERS).

1.  *Teachers Retirement System*

TRS membership is open to teachers. O.C.G.A. § 47-3-60(a). For purposes of the TRS, the term "teacher" includes not only "Classroom teachers" and "Persons employed in a clerical capacity," O.C.G.A. § 47-3-1(28)(A), but also school nurses, school librarians and administrative officials, O.C.G.A. § 47-3-1(28)(B)-(D). The term "teacher" also includes specified full-time public school managers or supervisors who elect to participate in the TRS: (1) "lunchroom managers or supervisors," (2) "maintenance managers or supervisors," (3) "transportation

43

managers or supervisors" and (4) "warehouse managers or supervisors." O.C.G.A. § 47-3-1(28)(E). Full-time lunchroom, maintenance, transportation and warehouse managers or supervisors may elect to become members of the TRS. O.C.G.A. §§ 47-3-63(a), 47-4-40(d). If these employees do not elect to become members of the TRS, then they are members of the PSERS. O.C.G.A. § 47-4-40(a). The TRS statute does not define the terms "manager" and "supervisor."

While the TRS statute provides that the term "teacher" includes maintenance and warehouse managers or supervisors, it does not make a similar provision for custodial managers or supervisors. Plaintiffs appear to assert that custodial managers or supervisors should be considered to be maintenance managers or supervisors. The Georgia legislature, however, differentiated "maintenance personnel" from "custodial personnel." *See* O.C.G.A. § 47-4-2(20) (defining "public school employee" as including "school bus drivers, school lunchroom personnel, school maintenance personnel, and school custodial personnel"). Therefore, the Court cannot conclude that the term "teacher" in the TRS statute includes custodial managers or supervisors.

According to Plaintiffs, "any employee" of the School District was eligible for the TRS prior to 1980, but after 1980 only supervisors and managers could participate in the TRS.

44

This assertion is based on the testimony of Kinard Latham, who served as the School District's plant services manager from 1974 to 1996.  Latham Dep. 25:9-26:17, 27:7-20.  Latham, however, misunderstood the law.  Ever since the TRS was established by the Georgia General Assembly, the TRS has always been open *only* to "teachers."  Teachers Retirement System Act, 1943 Ga. Laws 640, 645 § 3(1) ("Any person who becomes a teacher after January 1, 1944, shall become a member of the retirement system as a condition of his employment[.]"); *accord id. at* 641 § 1(5) (including teachers, supervisors of teachers, and administrative officials who supervise teachers in the definition of "teacher").  The definition of "teacher" did *not* originally include lunchroom, maintenance, and warehouse managers or supervisors.  In 1976, the Georgia General Assembly modified the definition of "teacher" to include "full-time public school lunchroom managers or supervisors, full-time public school maintenance managers or supervisors and full-time public school warehouse managers or supervisors" who opt in to the TRS.  Public School Employees' Retirement System Act Amended, 1976 Ga. Laws 577, 579 § 3.

    2.   *Public School Employees Retirement System*

PSERS membership is open to any "public school employee" who is not eligible for the TRS or does not elect to participate in the TRS.  O.C.G.A. § 47-4-40(a); *accord* O.C.G.A. § 47-4-2(20)

(stating that for purposes of PSERS, "public school employee" does not include teachers or other school personnel covered by the TRS).   The term "public school employee" includes "school bus drivers, school lunchroom personnel, school maintenance personnel, and school custodial personnel."   O.C.G.A. § 47-4-2(20).

B.   TRS Eligibility Determinations

No School District employees have the authority to approve or reject TRS membership applications.[16]   Rather, the School District can request that employees be considered for the TRS, and it is the responsibility of the TRS board of trustees to "determine in doubtful cases whether any person" is a "teacher" for purposes of becoming a member of the TRS.   O.C.G.A. § 47-3-1(28).

As discussed above, lunchroom, maintenance, transportation and warehouse employees may be considered "teachers" for purposes of the TRS if they are "managers or supervisors." O.C.G.A. § 47-3-1(28)(E).   Although the TRS statute does not define the terms "manager" and "supervisor," the TRS provided the School District with guidance on the meaning of those terms. When the School District requested TRS membership for several

---

[16] Plaintiffs contend that School District employees do have authority to approve or reject TRS applications.   In support of this assertion, Plaintiffs cite the deposition testimony of Kinard Latham.   Latham Dep. 25:9-26:11.   The cited testimony, however, does not establish that Latham or any other School District employee had authority to approve or reject TRS applications.

plant services employees in 1993 (including Plaintiffs Biggers, Dowdell, Griffin, and Richardson), the TRS denied the request because the TRS concluded that the employees were not managers or supervisors. The TRS informed the School District that a plant services employee must be "designated (by title) as a manager or supervisor" to be eligible for TRS membership. 1993 Letter from Rodgers/TRS. The TRS further stated that plant services employees who are not managers or supervisors are not eligible for TRS membership "even though the positions encompass supervisory responsibilities." *Id.*

Plaintiffs nonetheless assert that TRS membership is open to any employee who supervised a person, tool, or task. This assertion is based on the deposition testimony of Latham, who testified that it was his understanding that a "supervisor . . . is a person that supervises somebody or a person in charge of something that they are supervising." Latham Dep. 28:8-29:13. Latham's understanding, however, is just plain wrong. Under Latham's understanding, the TRS statute's limitation of membership to maintenance "managers" and "supervisors" would be discarded as meaningless because every plant services employee has some responsibility for supervising at least a tool or a task. Moreover, Latham's understanding directly contradicts the TRS's own definition of "manager" and "supervisor." The TRS statute gives the TRS—not an employee of the School District

47

such as Latham—the power to "determine in doubtful cases whether any person" is a "teacher" for purposes of becoming a member of the TRS.   O.C.G.A. § 47-3-1(28).   Therefore, the TRS's definition of those terms controls, not Latham's mistaken understanding.

### C.   TRS Enrollment of Unqualified Employees

It cannot be seriously disputed that there has been significant confusion among several School District employees (particularly Latham) regarding TRS eligibility.   During Latham's tenure, if a plant services employee asked to join the TRS, Latham provided that employee with a membership application.   Once the employee requested the application, Latham's assistant, Carolyn French, completed the TRS paperwork for Latham to sign.   Once Latham signed the paperwork, he sent it to the School District's personnel department.   As discussed in more detail below, that process has since been changed, and the School District's human resources department now processes TRS membership requests.

As discussed above, Latham believed that "supervisor" meant a person who supervised a person, tool, or task, and Latham tried to help a number of non-supervisor plant services employees whose roles encompassed supervisory responsibilities join the TRS.   It is undisputed that several plant services employees were granted membership in the TRS during the 1980s

even though they were not managers or supervisors.  Cooper Dep. 107:10-109:5.  According to Plaintiffs, the non-supervisory plant services employees who were accepted into the TRS were white.  Pls.' Facts to Which There Are No Genuine Issues ¶¶ 13-15, ECF No. 105 at 22-23.

D.   1993 TRS Enrollment Attempt

In 1993, Latham tried to help several more plant services employees join the TRS.  Those plant services employees included Plaintiffs Biggers, Dowdell, Griffin, and Richardson.  Latham wrote a memorandum to George Wylie, who was the School District's assistant superintendent for personnel at the time. 1993 Latham Mem.  In that memorandum, Latham stated that he received requests from several employees "who feel they are eligible" for the TRS.  *Id.* at 1.  Latham also stated that he had a "signed statement from [the employees'] supervisor indicating that they do oversee other employees that work under them."  *Id.*; *accord* Defs.' App. of Docs. in Supp. of Mots. for Summ. J. Ex. 4, Note from L. Bell 1, ECF No. 98-4 at 1 ("When Godfrey Biggers and Daryl Shealy are working together, Godfrey supervises Daryl.").  Wylie, in turn, wrote a letter to the TRS on behalf of the employees.  In the letter, Wylie listed the employees and their titles, and he stated that the employees were "employed in positions which encompass supervisory responsibilities."  1993 Wylie Letter to TRS.  Wylie further

stated: "Your consideration in granting Teachers Retirement System status would be greatly appreciated." *Id.*

Paul Rodgers of the TRS responded to Wylie's letter, stating that it did not appear that any of the employees were eligible for membership in the TRS "even though the positions encompass supervisory responsibilities." 1993 Letter from Rodgers/TRS. Rodgers further stated that "if a person is designated (by title) as a manager or supervisor, he would be eligible for TRS membership," and the person's application would have to state that he "*is* a manager or supervisor). *Id.*

E. School District Investigations Regarding TRS

In 1995, David Jackson, the School District's director of personnel services "became aware of a limited number of employees" who worked under Latham that were "erroneously permitted to apply for participation in TRS, even though they did not have the classification titles and did not perform the duties of a supervisor." Defs.' App. of Docs. in Resp. to Pls.' Mot. for Summ. J. Ex. 102, Jackson Aff. ¶ 6, ECF No. 126-2. After the error was discovered, the employees who were erroneously permitted to join the TRS "were permitted to remain in TRS because a mistake was made and the employees had relied upon that error." *Id.* Jackson "undertook to prevent additional errors in processing applications to TRS." *Id.* Accordingly, after 1995, the School District did not process TRS admission

requests for employees "who did not meet the statutory requirements of TRS." *Id.*

In 2000, the School District's treasurer, Fred Jones, concluded an investigation regarding TRS applications of plant services employees. Jones Dep. 29:15-24, 31:6-17, ECF No. 123-6. Jones initiated the investigation after plant services employees who were not permitted to join the TRS lodged a complaint in 1998 regarding TRS eligibility, contending that some ineligible plant services employees were permitted to join the TRS while others were not. *Id.* at 31:21-32:14; *accord* Defs.' App. of Docs. in Resp. to Pls.' Mot. for Summ. J. Ex. 116 Attach. 1, Letter from G. Hughley to G. Gilbert (May 4, 1998), ECF No. 126-16 at 2 (discussing complaints made to the NAACP following a 1998 meeting between Jones and plant services employees regarding TRS eligibility).

During his investigation, Jones reviewed a list of employees who were enrolled in the TRS, he reviewed their job descriptions, and he considered the TRS regulations. Jones Dep. 38:5-18. Jones concluded that employees with a job title such as "supervisor," "leaderman," "clerical," "director," and "manager" were properly enrolled in the TRS. Jones Dep. 49:3-16, 52:1-8. If those terms were not included in an employee's title, that "raised a question" in Jones's mind. *Id.* at 54:8-10. As a result of the investigation, Jones concluded that in

the 1980s Latham "permitted some Muscogee County School District plant services workers to fill out TRS applications and list erroneous job titles for themselves." *Id.* at 29:15-24 (citing previous affidavit testimony). Jones also concluded that "Latham's conduct was inappropriate and would not be tolerated." *Id.* at 30:7-15. Jones determined that it was an isolated incident and that "the proper procedures were in place to prohibit the conduct from occurring again." *Id.* In addition, Jones concluded that there are no employees who are not enrolled in the TRS but should be. *Id.* at 55:25-56:2.

The employees who lodged the complaint that prompted Jones's investigation asked that the ineligible employees be removed from the TRS, but Jones concluded that he did not have authority to do that. *Id.* at 54:11-25. Jones presented his findings to the superintendent and the school board, and they did not elect to seek removal of the employees who had erroneously been permitted to join the TRS. *Id.* at 57:5-19; Cooper Dep. 109:12-22 (stating that School District made the decision to permit three employees to remain in the TRS even though they were not eligible). Later, when Don Cooper joined the School District, he consulted with the superintendent and with counsel regarding the TRS membership of one ineligible employee, and the school board decided to let the employee remain in the TRS. Cooper Dep. 184:20-185:7, 187:2-8.

It appeared to Jones that the fundamental problem the employees complained of—being denied admission to the TRS—"could only be fixed by the Georgia legislature who enacted the laws that created the two different retirement systems." Jones Dep. 55:7-12. Therefore, Jones's objective was to "find a remedy that would be acceptable to the group who made the complaint and would be acceptable to the school district." *Id.* at 54:25-55:4. Accordingly, Jones proposed that the School District "acquire and provide . . . a supplemental retirement plan" for employees who were not eligible to enroll in the TRS. *Id.* at 55:5-7. The school board accepted the proposal and voted to implement a Supplemental Retirement Plan, a 403(b) defined contribution plan to which employees could contribute a percentage of their income and receive a matching contribution from the School District. *Id.* at 61:24-63:13, 98:12-99:2.

F.   School District "Supervisor" Policy

At some point, the School District promulgated a policy on the definition of "supervisor." Defs.' App. of Docs. in Resp. to Pls.' Mot. for Summ. J. Ex. 108, MCSD Policy on Definition of "Supervisor," ECF No. 126-8. Among other things, the policy is used for purposes of recommending TRS enrollment. *Id.* In determining whether an employee is a "supervisor," the School District's human resources department "looks at the actual job duties of the position." *Id.* "Job title does not determine an

employees' [sic] supervisory status[, and] employees are not considered supervisors merely because their job duties encompass some supervisory activities." *Id.* Under the policy, in determining whether an employee is a "supervisor," the School District evaluates a number of factors, including whether the employee has authority to recommend the promotion of another employees, responsibly directs other employers, has the duty to assign shifts and duties to other workers, and exercises authority that requires the use of independent judgment. *Id.* According to Cooper, the School District's definition of "supervisor" is based on several sources, including the TRS and PSERS statutes, TRS and PSERS guidelines, and letters to the School District from TRS and PSERS. Defs.' App. of Docs. in Supp. of Mots. for Summ. J. Ex. 76, Cooper Aff. ¶ 19, ECF No. 98-76; Defs.' App. of Docs. in Resp. to Pls.' Mot. for Summ. J. Ex. 102, Jackson Aff. ¶ 5, ECF No. 126-2 (stating that School District follows TRS statutory requirements "by examining both the titles of the job classification as well as the actual job duties of the classification").

G.   2007 TRS Requests

In 2007, several additional plant services employees asked to join the TRS. In response, then-director of plant services James Tanksley sent the employees a memorandum explaining that non-supervisory employees were not eligible for TRS membership

and that the issue was, at that time, the subject of litigation brought by plant services and custodial employees. Cooper Dep. Ex. 39, Mem. from J. Tanksley to All Plant Services Employees (Feb. 19, 2007), ECF No. 98-97 at 289. Tanksley encouraged the employees to contact their state representatives in support of a new law that would "open teacher retirement to all employees of school districts," and he offered to provide assistance with such correspondence. *Id.*

    H.   Analysis of Timely Federal Claims

    Plaintiffs' federal law claims fail for three independent reasons. First, Plaintiffs failed to point the Court to evidence demonstrating that they were qualified to participate in the TRS. In both the discriminatory compensation context and the failure-to-hire context, a plaintiff must establish that he was qualified for the desired wage or job. *Tucker*, 470 F. App'x at 835; *Vessels*, 408 F.3d at 768. It is undisputed that only "maintenance managers or supervisors" and "warehouse managers or supervisors" are eligible to join the TRS. Here, Plaintiffs pointed to no evidence that Brantley, a masonry mechanic, and Williams, a roofer, met the TRS's definition of "maintenance manager or supervisor" or "warehouse manager or supervisor." While Plaintiffs pointed to evidence that Mabry, a roofer, is "second in charge" and that his job thus sometimes encompasses supervisory responsibility, Plaintiffs pointed to no evidence

that the TRS considers "second in charge" maintenance employees to be "supervisors" within the meaning of the TRS statute.  And, as discussed above, though the TRS statute provides that the term "teacher" includes maintenance and warehouse supervisors, it does not make a similar provision for custodial supervisors like McCoy, Parham, and Thompson.   Therefore, there is no evidence that McCoy, Parham, and Thompson were eligible to join the TRS.

Second, although Plaintiffs make conclusory allegations that similarly situated white employees were permitted to participate in the TRS, Plaintiffs' counsel failed to point to actual evidence in the record demonstrating that Defendants treated similarly situated white employees differently than black employees with regard to enrollment in the retirement systems.  Plaintiffs have the burden to establish that they were "similarly situated in all relevant respects" to white employees who were permitted to join the TRS.  *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010).  The Court cannot discern from the evidence Plaintiffs cited which employees were accepted into the TRS, and it is also difficult to discern the race, job title, and job duties of each accepted employee. While some employees may have been treated differently than others, Plaintiffs did not point to evidence that these employees were "similarly situated in all relevant respects" to

Plaintiffs, and Plaintiffs failed to point to evidence supporting an inference that race was the basis for the disparate treatment. *Id.*

For these two reasons, the Court finds that Plaintiffs failed to make out a prima facie case of race discrimination. Therefore, Plaintiffs' § 1981, § 1983, and Title VII claims fail.

To the extent that the present record contains some evidence supporting a prima facie case but that Plaintiffs' counsel simply did a poor job of directing the Court to that evidence, the Court finds that Defendants are entitled to summary judgment for a separate reason. Defendants produced evidence demonstrating that the reason that employees were treated disparately, if they were in fact so treated, is that the School District and its employees did a poor job of administering the retirement system eligibility process. Their sometimes haphazard administration of that process may have allowed some employees to game the system, and it may have resulted in some employees being treated unfairly compared to others. However, Plaintiffs pointed to no evidence in the record showing that Defendants' explanation was a pretext for racial discrimination. Again, once an employer articulates a legitimate nondiscriminatory reason for its employment action, then the plaintiff has the burden to establish that each

proffered reason is pretext for discrimination.  *Vessels*, 408
F.3d at 768.  Without some evidence that Plaintiffs were denied
an opportunity to participate in the TRS based on their race and
that they were otherwise qualified to participate in it, their
federal law claims fail.  Accordingly, Defendants are entitled
to summary judgment as to Plaintiffs' federal law claims.

## IV.  Plaintiffs' State Law Claims

Plaintiffs also asserted state law claims for fraud, breach
of contract, and tortious interference with contract.  These
claims involve unique issues of state law.  Also, it appears
from the record that some of these claims may have already been
litigated, or are presently being litigated, in state court.  In
2007, several School District employees filed suit against the
School District, alleging that the School District discriminated
against the plaintiffs in the administration of TRS eligibility.
2007 Compl.; Whitaker Press Release (making clear that the
"discrimination" alleged in the 2007 Complaint was race
discrimination).  Plaintiffs in the 2007 state court action
include Biggers, Brantley, Dowdell, Griffin, Mabry, Marshall,
McCoy, Parham, Richardson, Starks, and Thompson.  The parties
did not provide the Court with any documents from the 2007
action other than the Complaint, and it is therefore not clear
from the present record how (or if) the case was resolved.

Given that today's Order disposes of all of Plaintiffs' federal law claims and given the nature of the remaining state law claims, the Court declines to exercise supplemental jurisdiction over them. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a [state law] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction[.]"). Accordingly, Plaintiffs' state law claims are dismissed without prejudice.

## CONCLUSION

Regarding the federal law claims, the Court grants the School District Defendants' summary judgment motions as to each Plaintiff: Godfrey Biggers (ECF No. 88), Carlton Brantley (ECF No. 104), Henry Crawford (ECF No. 90), Larry Dowdell (ECF No. 91), Melvin Griffin (ECF No. 94), Pondiel Mabry (ECF No. 89), William Marshall (ECF No. 96), Connie McCoy (ECF No. 99), Hayward Parham (ECF No. 100), Reginal Richardson (ECF No. 95), Jerry Starks (ECF No. 93), Patrick Stroud (ECF No. 92), Larry Thompson (ECF No. 97), and Calvin Williams (ECF No. 103). The Court likewise grants the summary judgment motions of Defendant Kinard Latham (ECF No. 101) and Defendant Thomas M. Shellnutt (ECF No. 102) regarding the federal law claims. The Court denies Plaintiffs' summary judgment motion (ECF No. 105).

Defendants' Motion to Strike (ECF No. 158) is moot.  The Court

dismisses Plaintiffs' state law claims without prejudice.


IT IS SO ORDERED, this 30th day of October, 2012.


S/Clay D. Land
                       CLAY D. LAND
                UNITED STATES DISTRICT JUDGE